IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DANIEL G. GRAYBILL**, | Case No. 3:18-cv-00127-IM |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **BRAD CAIN**, Superintendent, Snake River Correctional Institution, | |
| Respondent. | |

**IMMERGUT, District Judge.**

Petitioner Daniel G. Graybill ("Petitioner"), an individual in custody at Snake River Correctional Institution, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons that follow, Petitioner's Habeas Petition (ECF No. 1) is DENIED, and this proceeding is DISMISSED, with prejudice.

## BACKGROUND

On February 9, 2011, a Lane County grand jury returned an indictment charging Petitioner with one count of Sodomy in the First Degree. Resp't Exs., (ECF No. 19), Ex. 102. The indictment

PAGE 1 – OPINION AND ORDER

alleged that Petitioner sexually abused his daughter, KG, on one occasion between September 2009 and December 2010. *Id.* Trial commenced before a jury on May 26, 2011. Resp't Exs. 103–06.

## I.    The State's Case at Trial

The foundation of the State's case against Petitioner was the testimony of KG, who was seven at the time of trial. Tr. 32. KG testified that in the Fall or Winter of 2009, Petitioner pulled her pants down and "licked [her] private" where she goes "pee." Tr. 32, 44–47. KG testified that it happened only once, and that Petitioner told her not to tell her mother. Tr. 44, 45.

KG's mother, Tina Graybill ("Graybill"), testified that she was in the car with KG on November 30, 2010 when KG spontaneously announced that "Dad did something really gross a long time ago and he told me not to tell you." Tr. 112. KG then stated that Petitioner had "licked [her] pee-pee." Tr. 113. Graybill testified that she remained calm and further questioned KG:

> I went in the back seat with her and I sat and talked with her and I just said, "Has this happened before? Has he ever taken your clothes off before?" And she did tell me about him pulling her pants off and that he pulls her pants off and tickles her legs, and he thinks it's funny.

Tr. 113. Graybill reported KG's disclosure to the police and the Child Welfare Division of the Oregon Department of Human Services. Tr. 116–18, 146–47.

Forensic interviewer, Nichole Satterwhite ("Satterwhite"), interviewed KG at Kids' FIRST, a child advocacy center. Tr. 82–83, 100. Satterwhite testified to the specific techniques used when interviewing a young child, emphasizing that open-ended questions elicit the most accurate information from children. Tr. 89–90, 96. Satterwhite explained that leading questions may result in the child's acquiescence to an adult's authority, or in a child's adoption of an adult's statements as his or her own. Tr. 89–90. The prosecutor then played a video of Satterwhite's interview with KG, in which KG repeated the allegation of abuse. Tr. 100–03.

PAGE 2 – OPINION AND ORDER

## II.    <u>The Defense Theory at Trial</u>

The defense pursued the theory that KG had formed a "genuine mistaken belief" that Petitioner had abused her.  The defense presented the expert testimony of Dr. Phillip Esplin ("Esplin"), a forensic psychologist with a primary focus on child memory development.  Tr. 162. Esplin testified that children within KG's age range tend to "have some difficulties with what's called source monitoring, remembering why it is that they believe something to be true."  Tr. 165. Esplin testified that evaluating the credibility of a child who is genuinely mistaken in his or her belief is difficult, if not impossible, because "they believe what they're telling you."  Tr. 169.  On cross examination, Esplin specified that "tag questions" — such as "He touched your pee-pee, didn't he?" — should not be used when interviewing a child because such questions are coercive and "tell[] the child you already believe that you know what happened."  Tr. 203–04.

The defense pointed to several sources of potential confusion or outside influence on KG, including ongoing marital issues between Graybill and Petitioner and Petitioner's alcohol consumption.  Tr. 137–38, 253.  Arguments also arose about the family's finances and whether Graybill was communicating with third parties outside of the marriage.  Tr. 254.  According to Petitioner, such arguments were "[p]retty intense," and occasionally unfolded within earshot of KG.  Tr. 254.

On cross-examination, defense counsel questioned KG about whether Graybill had influenced her disclosure:

Q    When you were in the car there, you talking -- in response to the question about -- well [the prosecutor] just talked to you about when you were in the car with your mom and you told her -- or told your mom that your dad had licked your pee-pee. Remember that conversation?

A    Yeah.

Q      Okay.  Your mom had asked you if your dad had ever licked your pee-pee, didn't she?

A      No.  I just told her that.

Q      You didn't -- she didn't ask you some kind of question like that?

A      No.

Q      Do you remember telling -- remember [the prosecutor] talked about -- well, let me -- remember [the prosecutor] talking to you about this time you talked to this lady and a movie film was taken of your conversation with this lady?  Remember that?

A      Yeah.

Q      Remember telling the lady at that time that actually mom had asked you a question about something and then you responded this way?

A      Yeah.

Q      Was that wrong?

A      No.  Yeah, I think.

Q      You think it was or --

A      I sort of forgot what you said.

Q      Okay.  Do you remember when you talked to the lady that you told the lady that your mom had asked you a question about your dad and then you in response - - do you know what "response" means?

A      Yeah, when you answer someone.

Q      Yeah.  So in answer to your mom's question, that then you said a thing about your dad.  You remember telling her that?

A      Yeah.

Q      But now you're saying it wasn't a question your mom put to you, huh?

A      Yeah.

Q      So, what you're saying now is true, that you just said it, without a question from your mom?

PAGE 4 – OPINION AND ORDER

A        Yeah.

Q        So, is what you told the lady during this movie film, that was wrong then?

A        Yeah.

Q        Why did you say something was wrong to her?

A        I don't get it.

Q        What?

A        I don't get it.

Q        Okay.  Do you think you said something -- well, if you told the lady during the interview that was - - a picture was taken -- that your mom had asked you a question, but --

A        She didn't.

Tr. 53–55.  Graybill denied eliciting KG's disclosure, but admitted that she may have assessed previous situations at home by asking, "What was Dad doing?" or "What was going on here?". Tr. 128.

The defense presented two potential sources of KG's sexual knowledge.  Petitioner testified that three days before KG's disclosure, he engaged in sexual activity with Graybill on the couch while watching a pornographic film.  Tr. 262, 271.  Petitioner testified that while performing oral sex on Graybill, he noticed KG looking down from the top of the stairs in the direction of the television.  Tr. 272–73.  Petitioner also testified that KG had been present when her cousin commented that she had seen a nude construction crew at the County Fair and stated that "'[t]heir pee-pees were hanging out.'"  Tr. 284–287.

Lastly, the defense presented evidence that KG could have confused harmless tickling for something more nefarious.  Petitioner testified that he frequently tickled KG, particularly on her thighs, ears, and neck.  Tr. 256.  Petitioner explained that KG was often wearing "really loose"

sweatpants when such tickling would occur, and that he would "yank them down" because he "didn't want to bruise her."  Tr. 256.  On cross-examination, defense counsel discussed the tickling with KG:

> Q    Remember -- well, remember [your parents would] sometimes kind of get their lips down and kind of (indicating) like this to tickle you?
>
> A    Yeah.
>
> * * * *
>
> Q    What would they call that as far as what you remember?
>
> A    I think a raspberry.
>
> Q    A raspberry, okay.  And that would tickle, wouldn't it?
>
> A    Yeah.
>
> Q    Make you laugh?
>
> A    Yeah.
>
> Q    You got tickled on your neck by that, sometimes on your neck?
>
> A    Yeah.
>
> Q    Sometimes on your tummy?
>
> A    Yeah.
>
> Q    Sometimes on your legs?
>
> A    Yeah.
>
> * * * *
>
> Q    And sometimes your mom or your dad would tickle you, sometimes make a face and they'd drop your pants and tickle your legs, wouldn't they?
>
> A    Yeah.
>
> Q    And that was okay, wasn't it?

A Yeah.

\* \* \* \*

Q When you say that this one time you get licked, your pee-pee, its possible that you're mistaken on that and he was just giving you kind of a raspberry.  Isn't that right?  Isn't it?

A Sort of.

Tr. 64.

## III. <u>Closing Arguments</u>

During closing argument, the prosecutor recounted the State's evidence and replayed the video of KG's interview with Satterwhite, emphasizing that the interview had been conducted in a manner "designed to get at exactly what happened to this child."  Tr. 337.  In response, defense counsel argued that the video was "misleading" because KG was "totally mistaken" in her belief that Petitioner had abused her.  Tr. 342.  Defense counsel explained:

> You know, I can test.  I can figure out credibility.  You look for cues, you know.  And, you know, things of that sort of thing.  You know, they look you in the eye; they don't look you in the eye.  Defensive, whatever.  But you heard from Dr. Esplin that that is -- you can't do that.  You can't do that.  That's not an appropriate test when you're dealing with somebody who has, for particular scientific reasons, come to believe what they're saying is true.  It doesn't work.  It doesn't work.

Tr. 343–44.  Defense counsel reviewed the potential sources of confusion in KG's memory, arguing that KG had confirmed on cross-examination that she might have confused harmless tickling with abuse.  Tr. 364.

In his rebuttal, the prosecutor addressed the inconsistencies in KG's testimony:

> How did Mr. Jagger ask [KG] questions?  Almost every one of his questions, what were they?  Tag leading questions.  Right?  Everything that he says.  "Your mom told you what to say, didn't you?  She did, didn't she?"  All right.  And this great question that he's saying you should consider this answer that she gave about raspberries or licking your pee-pee, right, he goes through all of these questions.  And, remember, we're high-status adults here, right.  You put a six-year-old, seven-year-old up on the stand, and make her promise to tell the truth, and there's a judge

sitting up there, and people listening to her, and we're the only ones that get to talk to her, that makes us high-status adults.  More powerful to her than the average person.  And who is the person who is not asking these truth-seeking questions, but asking what Dr. Esplin calls coercive questions?  Who's asking [KG] coercive questions?  Mr. Jagger.  Every one of them, going at her, question after question.

> . . . .

Did you learn anything from that, except for how coercive Mr. Jagger can be?  No, you didn't.  Those answers have no ability to get to any truth at all.

Tr. 391–93.  The prosecutor also responded to defense counsel's suggestion that the jury must be on guard against misleading evidence proffered by the State:

Don't be misled.  All this doubt that Mr. Jagger's trying to plant in your head is based off of his coercive questions of [KG].  Who was looking for the truth in this case? Nichole Satterwhite.  Everybody that Tinamarie Graybill called, right?

> . . . .

My questions were exactly like the forensic interview questions, just designed to get to the free recall.  That's all.  The only person that wasn't asking questions from all the research has told us, from what the expert has told us, the only person that isn't asking the questions that are designed to get to the truth was Mr. Jagger.  Why?  Something to prove?  Something to hide?  Concerned about what the truth was going to come out as?  The truth is what matters here, and the process in which we get to the truth is what matters.

Tr. 393–94.  During the State's rebuttal, defense counsel made two objections, neither of which concerned the prosecutor's statements about how the defense questioned KG.  Tr. 399, 404–05

The jury convicted Petitioner on the single sodomy charge.  Tr. 412; Resp't Ex. 133.  In a separate proceeding, the trial judge imposed a custodial term of 300 months, followed by lifetime post-prison supervision.  Tr. 412.

## IV.    Direct Appeal

Petitioner filed a direct appeal, alleging the trial court erred when it allowed the prosecutor to vouch for KG's credibility during closing arguments, when it failed to *sua sponte* grant a mistrial or give a curative instruction to remedy the prosecutor's vouching, and by imposing the mandatory sentence.  Resp't Ex. 107, at 2–3.  The Oregon Court of Appeals affirmed the conviction without

PAGE 8 – OPINION AND ORDER

opinion. *State v. Graybill*, 259 Or. App. 139 (2013). The Oregon Supreme Court denied review. *State v. Graybill*, 354 Or. 699 (2014).

## V.   <u>State Postconviction Relief Proceedings</u>

Petitioner sought state postconviction relief ("PCR"), alleging five claims of ineffective assistance of counsel ("IAC"), including trial counsel's failure to object to the prosecutor's vouching during closing arguments. Resp't Ex. 113, at 4–12. In opposition, the State submitted an affidavit by trial counsel detailing his lengthy legal career involving "all types and manners of [criminal] cases, including all manner of sexual abuse cases." Resp't Ex. 137 at ¶ 1. With respect to Petitioner's claim that trial counsel should have objected to the prosecutor's vouching during closing arguments, trial counsel indicated that his objections during the State's closing should speak for themselves:

> Throughout trial, and including the State's closing arguments, I had the opportunity to personally observe the facial expressions, vocal inflections, demeanor, body language, and all other aspect of witness credibility as each witness testified. I also had the opportunity to observe the facial expressions, demeanor, and body language of the trial Judge and the individual jurors both during trial testimony and during closing arguments. Based on my personal observations, I considered and rejected other possible objections because my professional assessment was that additional objections did not have a reasonable likelihood of success, and would not have made a practical difference in the case even if the objections had been sustained. Based on my personal observations during [Petitioner's] trial and my prior experience before the Lane County court, I had no reason to believe that the court would have sustained additional defense objections. I also had no reason to believe that the court would have granted a motion to strike or allowed a limiting instruction.

*Id.* at ¶ 3.

The PCR court denied relief on all claims. Resp't Ex. 139, at 11. After expressing admiration for trial counsel's extensive experience representing both the State and defendants in criminal matters, the PCR court opined that he "was probably just doing what I was mentioning, not wanting to pop up all the time, because apparently, at other times, there were some objections

PAGE 9 – OPINION AND ORDER

along the same lines." *Id.* In a written judgment, the PCR court reiterated that trial counsel's failure to object was "a tactical decision . . . which was reasonable under the circumstances." Resp't Ex. 140, at 2.

On January 22, 2018, Petitioner filed a Petition for Writ Habeas Corpus in this Court, raising two grounds for relief:

> **Ground One:** Trial counsel failed to provide effective assistance in violation of the Sixth and Fourteenth Amendments to the United States Constitution when he failed to object to the prosecutor's argument that improperly punished the petitioner for exercising his Sixth Amendment right of confrontation and his right to stand trial and put the state to its burden of proof.
>
> **Ground Two:** Trial counsel failed to provide effective assistance in violation of the Sixth and Fourteenth Amendments to the United States Constitution when he failed to object to misleading comments by the trial court regarding jury instructions and to seek clarification for the jury.

Pet., at 3. In his supporting brief, Petitioner acknowledges that he has not presented grounds one and two to any state court. *Id.* at 4. Respondent moves to deny habeas relief on the basis that both grounds are procedurally defaulted. Resp. to Pet., ECF No. 17, at 5–7.

## DISCUSSION

## I.    <u>Petitioner's First Ground for Relief</u>

In his First Ground for Relief, Petitioner argues that trial counsel provided ineffective assistance by failing to object to portions of the prosecutor's rebuttal closing argument that "underscored the difference in how he and petitioner's lawyer questioned the complainant . . . in effect punishing the petitioner for his lawyer's use of the most common and effective tool of cross-examination, the use of leading questions." Pet., at 3.

It is undisputed that Petitioner failed to present Ground One in state court prior to initiating this proceeding. Respondent argues that because Petitioner can longer exhaust this claim under Oregon law, it is procedurally defaulted. *See* OR. REV. STAT. § 138.510(3) (setting forth a two-

year limitation period in which to file for postconviction relief); Or. Rev. Stat § 138.550(3) (instructing that all grounds for relief must be asserted in the original or amended postconviction relief petition unless the grounds could not reasonably have been raised). In response, Petitioner argues that because PCR counsel was ineffective in failing to raise Ground One in state court, his procedural default should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Br. in Supp., at 11–12.

A habeas petitioner generally must exhaust all remedies available in state court, either on direct appeal or through collateral proceedings, before a federal court may consider granting habeas relief. 28 U.S.C. § 2254(b)(1). If the petitioner fails to fairly present his federal claims to the highest state court, and state procedural rules would now bar their consideration, the claims are procedurally defaulted. *Hurles v. Ryan*, 752 F.3d 768, 779–80 (9th Cir. 2014); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999). If an individual in state custody procedurally defaults his federal claims, habeas relief is precluded absent a showing of cause and prejudice, or if failure to consider his federal claims would result in a fundamental miscarriage of justice. *Hurles*, 752 F.3d at 780; *Martinez*, 566 U.S. at 9–10; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The ineffective assistance of postconviction counsel generally does not constitute "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 752. In *Martinez*, however, the Supreme Court recognized a narrow exception to this general rule: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. To establish "cause" sufficient to excuse a procedural default under *Martinez*, a petitioner must show that (1) the underlying ineffective-assistance-of-trial-counsel claim was substantial; (2) counsel at the state collateral review proceeding was ineffective; (3) the state collateral review proceeding was the initial review

proceeding for the claim; and (4) state law required the petitioner to first raise the claim in the initial-review collateral proceeding. *Martinez*; 566 U.S. at 17–18; *Detrich v. Ryan*, 740 F.3d 1237, 1244–1245 (9th Cir. 2013).

### A.    Initial-Review Proceeding and State Law Requirements

In Oregon, PCR proceedings are the first forum available to review IAC claims. *State v. Robinson*, 25 Or. App. 675, 550 P.2d 758 (1976) (holding ineffective-assistance claims are "properly resolved only in a postconviction proceeding"). Oregon law also requires ineffective-assistance-of-counsel claims to be raised at a PCR proceeding. *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (acknowledging that Oregon requires claims for ineffective assistance to be raised in a collateral proceeding). Accordingly, Petitioner satisfies the third and fourth prongs of the *Martinez* test.

### B.    Substantiality and Ineffectiveness Under *Strickland v. Washington*

To satisfy the first prong of the *Martinez* test, the underlying IAC claim must be "substantial" — that is, the petitioner "must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. Petitioner argues that his IAC claim is "substantial" because trial counsel failed to raise an objection to the prosecutor's rebuttal closing argument disparaging the defense's cross-examination of KG. Br. in Supp., at 14–16. Petitioner contends that had trial counsel objected, he would have been "entitled to relief, very likely a mistrial," or at least a strong curative instruction, which reasonably could have resulted in a different outcome given the "she-said/he-said" nature of the case. *Id.* at 20.

To evaluate whether a claim is "substantial," the Court applies the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 686. Such a

showing requires the petitioner to overcome a strong presumption the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. The first prong of the *Strickland* test thus is satisfied only if the petitioner demonstrates "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* When the deficient performance alleged is counsel's failure to raise an objection, a habeas petitioner must establish that the decision to forego objection fell below an objective standard of reasonableness, and that if counsel had objected, there is a reasonable probability that the objection would have been sustained and the outcome of the trial would have been different. *See Juan H. v. Allen*, 408 F.3d 1262, 1273–74 (9th Cir. 2005) (noting that counsel is not ineffective for failing to raise a meritless objection). However, failure to raise an objection during closing argument generally does not constitute deficient performance. *Zapata v. Vasquez*, 788 F.3d 1106, 1115 (9th Cir. 2015). Only where counsel remains silent in the face of "egregious" misconduct does the failure to object during closing argument fall below an objective standard of reasonableness. *Id.*; *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (citing *Strickland*, 466 U.S. at 669).

Petitioner has failed to demonstrate that trial counsel's failure to object amounts to ineffective assistance of counsel. The record does not establish that the prosecutor's statements constituted objectionable misconduct. *See Zapata*, 788 F.3d at 1112 (whether counsel's failure to

object to a prosecutor's remarks during closing argument was deficient turns on whether the challenged remarks amount to objectionable misconduct). The prosecutor's statements, when viewed in the context of closing arguments as a whole, were largely in response to trial counsel's arguments that the State's evidence was misleading because KG was mistaken in her belief. Drawing on testimony from both experts, the prosecutor argued that the manner in which KG had been questioned by trial counsel did not comport with the protocols used by forensic interviewers. Such statements attempted to sow doubt as to the efficacy of the way in which trial counsel questioned KG, and did not attack trial counsel for merely cross-examining KG.

Moreover, trial counsel anticipated the prosecutor's challenge concerning the manner in which he questioned KG and addressed the issue in closing argument. Specifically, trial counsel clarified that questioning witnesses at trial is "done differently than you might do investigative-wise in an interview with a child," and explained that attorneys generally employ leading questions on cross-examination, but cannot use leading questions on direct examination. Tr. 345. He also encouraged the jury to be skeptical of the prosecutor's timing:

> The reason I bring this up is this: Is that -- I'm not criticizing how [the prosecutor] asked any questions of [Petitioner] or Dr. Esplin, anybody of that nature. It will be interesting to see if [the prosecutor] criticizes me for leading questions of [KG] when he stands up again and talks to you if he does. You can't say anything, but you can look him in his eye, say "why didn't you bring that up in your first argument when Mr. Jagger had a chance to respond?"

Tr. 345–46.

Trial counsel reasonably could conclude that his prior remarks adequately anticipated and effectively countered the prosecutor's argument. Furthermore, reasonable trial counsel could have foregone objection to avoid highlighting the issue further or to avoid irritating the jury. As trial counsel explained during Petitioner's PCR proceedings, he considered and ultimately rejected additional objections during closing argument due to the demeanors of the judge and jury, and the

PAGE 14 – OPINION AND ORDER

apparent likelihood that such objections would have been unsuccessful. Accordingly, Petitioner has failed to demonstrate that trial counsel's failure to object during the prosecutor's rebuttal fell below an objective standard of reasonableness.

Any possible prejudice was further mitigated by the trial judge's instructions to the jury that "the opening statements and closing arguments of the attorneys" did not constitute evidence, and were "merely intended to help [the jury] understand the evidence" presented. Tr. 7–8. She further advised that the questions asked of witnesses are not evidence, and could be considered "only to give meaning to the witness's answers." Tr. 8. The jury is presumed to have followed those instructions. Therefore, based on the victim's testimony, which was consistent with her prior disclosure, there is no reasonable probability that the result of the proceeding would have been different if trial counsel had raised an objection to the prosecutor's arguments concerning the manner in which the defense cross-examined KG. *See Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (finding counsel's failure to object to a "manifestly improper" argument at close did not prejudice the petitioner where other evidence of his guilt was substantial, and the jury was instructed counsel's statements were merely argument and not evidence).

Under the circumstances of Petitioner's case, trial counsel could reasonably have abstained from objection because the substance of the challenged statements was adequately addressed in his own closing argument, and because further objection could have placed undue emphasis on the issue or inflamed the jury. As such, trial counsel's failure to object to the prosecutor's comments concerning the manner in which the defense cross-examined KG was not constitutionally ineffective. Furthermore, PCR counsel was not constitutionally ineffective in failing to assert such a claim, particularly in light of the numerous IAC claims PCR counsel did raise. *See White v. Nooth*, 770 Fed. App'x 412, 414 (9th Cir. 2019) (noting that in evaluating PCR counsel's

PAGE 15 – OPINION AND ORDER

performance, the court must "recognize that the 'process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy'").    Accordingly, Petitioner has not established a "substantial" ineffective assistance of trial counsel claim, and PCR counsel "could not have been ineffective for failing to raise the ineffective assistance of counsel claim in state court" to excuse his procedural default under *Martinez*.  *See Sexton*, 679 F.3d at 1161 (holding PCR counsel could not have been ineffective for failing to raise IAC claims where trial counsel was not ineffective). Because Petitioner's procedural default is not excused, he is not entitled to habeas corpus relief on his first claim.

## II.    **Petitioner's Second Ground for Relief**

As previously noted, Petitioner does not address the claims alleged in his Second Ground for Relief.  Additionally, Petitioner does not attempt to refute Respondent's argument that Ground two is procedurally defaulted, and that he has not demonstrated cause and prejudice to excuse the procedural default, or that a fundamental miscarriage of justice would occur if the Court declined to address Ground Two.  Accordingly, this Court denies habeas relief on this ground on the basis of procedural default and because Petitioner has failed to sustain his burden to demonstrate why he is entitled to habeas relief.  *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (the petitioner carries the burden of proving his case).

///

///

///

///

///

## CONCLUSION

Based on the foregoing, the Petition for Writ of Habeas Corpus (ECF No. 1) is DENIED, and this proceeding is DISMISSED, with prejudice.  Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this 20th day of May, 2020

Karin J. Immergut
United States District Judge